The first argued case this morning is number 16, 1945, Ratheon Company v. Indigo Systems Corporation. Mr. Cunningham. Thank you, Your Honor. Proceed. May it please the Court. Your Honor, at trial, Ratheon pursued trade secrets. The jury found four of them to be secret. The jury did not find misappropriation. Given the weight and the evidence, given the evidence at trial, no reasonable juror could have concluded that misappropriation did not occur for the four trade secrets that were found to be secret. What is your view of the basis for the verdict that the trade secrets, although they were trade secrets, so we will treat them that way, were not used by Indigo Systems or that they were not misappropriated? Well, they said they found they were misappropriated. They found they were trade secrets. Yes, Your Honor. They found they were trade secrets, but when they asked the second question, was there misappropriation, on the four in which they found they were secret, they did not find misappropriation. They found they were not used or that they were not wrongly taken. Well, the question on the jury charge was misappropriation, Your Honor. It was, if you answered no to question two, identify which alleged trade secrets are in fact secrets. I'm sorry. That was the one. Did Ratheon prove by a preponderance of evidence that Indigo misappropriated one or more of the secrets? That was the question on the charge. The jury was asked, do you find any secret? They found yes to four. The next question was, do you find misappropriation? Misappropriation under CATUSA, the relevant law, is use or disclosure based on improper means. Before we can figure out whether there is misappropriation of a trade secret, we first have to figure out what is the trade secret. What is the scope of the trade secret? Absolutely, Your Honor. There wasn't any instruction to the jury saying, trade secret number 14, here's the definition of it. Absolutely, Your Honor. And I believe that was the burden of Indigo. They did not object to the definition or the description. Is there a burden? I'm sorry? You're the plaintiff? Yes. Is there a burden to identify what the trade secret is? No, Your Honor. We assigned the trade secrets. The jury charge actually defined the trade secret. It said method, and number 14 is the first one I'm talking about. Why isn't it your burden to establish what the trade secret is? Well, Your Honor, I believe we did. Both in the jury charge and the evidence at trial, we identified what the trade secret was. How do we know what the definition is? Between the testimony from Raytheon's witnesses and Indigo's witnesses, the definition of trade secret 14 was agreed upon. It was a series of cascading bakes. It was the method and use of a sequential vacuum bake. Indigo would like to say that it was a specific recipe, a time, a temperature, and a pressure. But if that's the definition of the trade secret, that was well known. I'm sorry, Your Honor? If that's the definition of the trade secret, that was well known, to have a cascading bake. Actually, Your Honor, the evidence at trial found that the trade secret, the use of a sequential vacuum bake or a cascading bake, as practiced by Raytheon and Indigo, was not in the public domain and was not well known. You're changing the definition of the trade secret. The question is, is a cascading bake, the general concept, well known? And, yes, it was. That can't have been the trade secret that the jury found to exist. It had to be the cascading bake based on certain particular parameters, right? Your Honor, when Steve Black, Raytheon's expert witness, was asked what— Try to answer my question. Certainly. The evidence at trial from both Raytheon and Indigo witnesses was that trade secret 14 was defined as a series of cascading bakes. That was the definition. Any series of cascading bakes? Yes, Your Honor. That was the definition that was given. That was the description that was given to the jury by both witnesses from Raytheon and Indigo. That is the definition of trade secret 14. There's no testimony anywhere in the record where there was a more specific conception of the trade secret number 14 other than the basic concept of doing the sequential vacuum bake? Is that what you're telling me? No, Your Honor. The testimony at trial was the trade secret was a series of cascading or sequential vacuum bakes that were product dependent. The time, temperature, and pressure were based on the products. The exact recipes for any cascading bake were product dependent. Both witnesses from Raytheon and Indigo agreed that a cascading bake or a sequential vacuum bake as practiced was not in the public domain, was not known, and that the recipes were product dependent. You keep saying as practiced, and it seems to me you're changing the definition of the trade secret even as we talk about it. Is it the general concept of the cascading bake, or is it the peculiar circumstances here? It is the concept of a sequential vacuum bake. The concept of vacuum baking? The general concept, regardless of the actual parameters. Yes, even as Indigo's witness testified that the series of cascading bakes is not in the public domain. Who testified that the general concept was not in the public domain? Could you show me that? Mr. Cannell. I believe it as. I'm sorry, Your Honor. Let me pull up the record site for you because that's more important. App site 9805-06. And I will read from the record. Your Honor, I do not know the volume. You know, you're supposed to bring the appendix and the briefs and things like that, the oral argument with you. I have the site, Your Honor. I just don't know. I have all the record excerpts that I needed to decipher. I have the briefs. I apologize for not having the appendix, which volume it's from. It is from appendix 98, page 9805-06. Indigo's expert was. Wait. I'm sorry? Wait. Certainly. Okay. It seems to be in volume 5. My apologies, Your Honor. What is it? 98-05-06. Okay. Indigo's expert witness was asked, would you agree with me. What line is this on? Starting on line 25 on 9805, going to line 5 on 9806. Would you agree with me? I believe you would agree with me that for trade secret number 14, the piece part vacuum bake process, that there are no public domain documents discussing the concept of a sequential bake as opposed to a final piece part bake. Answer, yeah. I think that's correct. This was Indigo's witness, their expert, who admitted that the trade secret 14, the concept of a sequential vacuum bake. Yeah, but it's related to the piece part vacuum bake process. It's talking about an individual process. Where does somebody say that the general concept of a sequential bake is a trade secret? Right there on line 3, Your Honor, discussing the concept of a sequential. I don't read it that way. Is there any other place? Your Honor, that's the most definite and direct citation in the record. I guess another way of looking at this is the question isn't whether you can point to some testimony somewhere in the record that defines the trade secret in a way you like. The more relevant question is, was there testimony in the record that arguably defines the trade secret in a much narrower way, in the way the other side likes, that would be reasonable for a reasonable jury to accept as the proper conception of your trade secret? And if the answer to that is yes, then I think we're done. I would agree with you, Your Honor, but there is not. There is no citation. There is no evidence in the record at all where the definition of trade secret 14 was more narrowly defined. The concept of piece part vacuum baking with recipes as being product dependent was discussed, but never once, and in fact Raytheon was asked on cross-examination, is it two steps, five steps, 50 steps? And the answer was it is a cascading series of bakes that is product dependent. At no point during the trial ever was trade secret 14 given a more specific or narrow definition by any witness or document. Indigo did not object to the jury charge as drafted. Indigo did not request an instruction to the jury that provided a more specific definition of trade secret 14. The witnesses agreed that the trade secret was a cascading series of bakes. Let me take you back to the path that I was trying to understand. That is to accept that at least for the four items that the jury found were trade secrets. Nonetheless, they found no misappropriation, and that was the inquiry that seems to me to be uncertain. And again, was there no misappropriation because there was evidence that this information, although it was trade secret, was not used, not embodied in their product? Well, Your Honor, at least with respect to trade secret 14, Indigo admitted to practicing the exact same trade secret, a sequential vacuum bake. They admitted it. I believe the jury erred by not finding misappropriation given the admission by Indigo that they used it. There was admissions by Farhad Mirbad, one of the packaging engineers from Indigo, also from Indigo's expert, Mr. Jonathan Knaut. He admitted, they both admitted, that Indigo practices a piece-part sequential vacuum bake. Given that testimony, and it was not contradicted, it was against the evidence, and no reasonable juror could conclude no misappropriation. Well, that's what I'm trying to understand. Sure. Nonetheless, that was their verdict. That was their verdict, but that's the, in our opinion, that is what the appeal is based on, is that no reasonable juror could have concluded that. Given the admissions by Indigo that they practiced the trade secret. On appeal, Indigo has tried. The problem is there's plenty of evidence in this record that the general concept of a cascading bake was well-known. There is plenty of evidence in the record that vacuum baking is well-known. There was no evidence in the record that a sequential vacuum baking process is, and their expert admitted, that the concept of a sequential vacuum piece-part bake is not in the public domain. And regardless, Your Honor. Weird. I'm sorry? Weird. What I just read from you, AB 9506 to 9505-06, Your Honor, Mr. Connell admitted that the concept is not in the public domain, and the jury found that it was a secret. It was defined on the jury charge as a method and use of sequential vacuum bake. The testimony at trial was that the trade secret was the use of sequential vacuum baking. It was never defined, Judge Chen, as a specific, it must be three stages, four stages, five stages, it must be this temperature, it must be this pressure. It was never defined that specifically. It was always defined as a series of vacuum bakes that are product-dependent. The jury found it to be a secret based in part because everyone agreed it was not in the public domain. Indigo admitted to using the trade secret, Judge Newman. It was no reasonable juror could conclude no misappropriation given the admission. That is what the appeal is about, is that with the testimony and with the admissions that are uncontroverted, no reasonable juror could have concluded no misappropriation once they concluded there was a secret. That's with respect to trade secret 14, Your Honor. I see I'm on my rebuttal time. We'll save you rebuttal time. Let's hear from the other side. Mr. Palmore. Thank you, Your Honor, and may it please the Court. I'm Joseph Palmore here on behalf of Indigo Fleer. There was ample evidence supporting the jury verdict of no misappropriation in this case. Raytheon is effectively reprising its jury argument. It points to evidence in its favor and asks for inferences in its favor and says that a finding of misappropriation could be made based on that evidence. I thought there was a lot of evidence in the record that the general notion of a cascading fake was in the public domain. Is that true? Absolutely, Your Honor. Why don't you show us where the evidence is? Sure. So my colleague on the other side talked about our expert, Mr. Knauf. If you look at Volume 5 of the appendix, page 9727, Mr. Knauf is asked about this very concept and explains that it is public record. I'll give you a line. Starting at page 9, he's talking about his time. Line? Line 9. I'm sorry. Line 9. He's talking about his prior employment before the relevant period at a company called ICC and says, let's talk about that period. Did you have any experience with a sequential vacuum bake? Yes, absolutely. And what was that? Well, we did it all the time. We had piece part ovens. We had ovens that were used for assembly, sub-assembly baking. And then the final baking was done on the vacuum system while you're actively pumping on the doer. And then the exchange goes on. And if you look over on the opposing page, 9728, line 10, so you know it's piece part baking and final baking. I think it is well known. The intermediate stuff is just piece part baking of the part that's never been baked before. So to me it's a distinction without a difference. All of that testimony shows that the concept of piece part baking and sub-assembly baking was well known. All of that testimony, of course, has to be. So what was the position in defense that all of these procedures were independently developed or just that they were not protectable and therefore were properly transferred? Judge Newman, to the extent they were protectable, it was the recipes that were protectable, the specifics of the process, time, temperature, pressure, and the evidence. The specifics were misappropriated. And the specifics were not misappropriated. To be sure, FLIR used piece part baking. Everyone in this industry does when manufacturing. Let me go back to the question. Yes. Is the position that all of this was independently developed? Absolutely, Your Honor. Or that it was a matter of entitlement because of either reverse engineering or it's been published? The trade secret, as properly understood and as argued to the jury, was not used, was not acquired. The specific times and temperatures, the specifics of the process were independently developed. And I can point you to that evidence. You say it was not acquired. Was independently developed? This is what I'm trying to understand as to what was behind all of this. It was not acquired. I understand, Your Honor. It was not acquired. And then it wasn't independently developed in the sense of they ended up at the same place through independent development. The processes were actually dramatically different. And again, Mr. Knauth's testimony, this is at 9730, which must be accepted as true, he talks about the dramatic differences between the two processes in terms of time, temperature, pressure. And that evidence, again, I think by itself provided a basis for a reasonable jury to conclude that there was no acquisition because they could look at the dramatic differences between the processes and make that reasonable inference. And, of course, on this standard of review, that's the question. What could a reasonable jury do? This was a 17-day trial. There were more than 30 witnesses. There were thousands of pages of documents, as the court knows, from the volume of the joint appendix. The jury was quite attentive. The jury said some of these things were trade secrets. Most of them weren't. But then it said none of them were misappropriated. To overturn that verdict for a plaintiff, an unsuccessful plaintiff, to overturn that verdict, it has to show that the evidence in its favor was so overwhelming that any reasonable jury would have been compelled to accept it, even crediting all the evidence on the other side, even giving FLIR the benefit of all available inferences on the other side. Your counsel just said a few moments ago that the jury was charged with a particular understanding of Trade Secret 14 that sounded like a very basic conceptual definition. Your Honor, if you look at the verdict form, it was simply a list, three or four words per. There was no jury charge in terms of here's the definition of the trade secret. And I think that's key here because, as the court pointed out, it's plaintiffs. It's the owner of the punitive trade secret that has the obligation to define it under California law. That's their obligation because otherwise you can't put on a defense if you don't know what's being claimed. So you're saying what happened here was a trial where there was a lot of talk about trade secret and then both sides had their different competing understandings of what the trade secret was, and then it was left to the jury to try to draw from the competing stories what was the trade secret and then figure out whether that was misappropriated? Well, Your Honor, I think one could certainly get that impression now based on how Raytheon has briefed the case. At the jury trial itself, we think it quite clear that the Trade Secret 14 that was claimed was the specific recipes, the times, the temperatures. In the closing argument of the jury, you mean? There was reference by Fleer's counsel to that aspect of the trade secret in the closing argument. What we're struggling for is to find out what the jury thought the trade secret was or what the trade secret was argued to be. There's no oral charge defining the trade secret. The jury form doesn't really define it. The question is did they define it in their argument to the jury? Not in the closing argument, Your Honor, but I think there are two key points to keep in mind here. One is that to the extent that there is ambiguity or uncertainty about the scope of the trade secret, that doesn't mean that Raytheon wins. That means that Raytheon loses. The NAI systems case from the Ninth Circuit that we cite in our brief holds that when the plaintiff has failed to discharge its California law duty to define the trade secret with specificity, no judgment can be entered on misappropriation because you can't figure out what has or hasn't been misappropriated if the plaintiff hasn't fulfilled its obligation to define the trade secret. So to the extent that there's confusion about what the trade secret was, that means Raytheon loses. It certainly doesn't mean they can overturn the jury verdict. A lengthy trial, enumerated trade secrets, and you are saying that nobody said what a trade secret is? Not in the jury charge, but, Your Honor, Raytheon's counsel and witnesses did. I'm not asking about the jury charge. You're answering a different question, which is a matter of concern. My question is, was the jury throughout all of this trial which dealt with trade secrets, you're telling us they were never told what a trade secret is? No, Your Honor. To the contrary, they were repeatedly told by Raytheon's counsel and Raytheon's witnesses  and I'm happy to point to that testimony that we cite in our brief. Raytheon's expert at 10390 says, the particular details of this trade secret are the processing requirements, including time and temperatures for each material type that is necessary to ensure maximum vacuum life. Their own witness, Black, this is at 7373, he's being examined by Raytheon's counsel. Raytheon's counsel reads something from a document that refers to, a FLIR document that refers to vacuum degassing of subassemblies is required to maintain vacuum life requirements. In general, you want to vacuum, bake the highest temperature possible for the longest amount of time tolerable and ask, is that one of our trade secrets? Black, Raytheon's witness says, I think it's actually reasonably well known. It's just if you want to clean this stuff up, the hotter you get it, the longer you do it. That was well known, he says. And of course... It's well known that you need to clean it, but not the detail of how they achieved it. Correct, because then he goes on to say, and of course, you're bounded by what the part can stand and that's how you get into the trade secret here. What the part can stand, temperature, time, pressure. Mr. Sharp, who is the employee who Raytheon says disclosed, who brought the trade secret with him from Raytheon, is being examined by Raytheon's counsel. And counsel says, in fact, you acknowledge that those recipes... I'm sorry, 6816? You acknowledge that those recipes are Raytheon's trade secrets, don't you, sir? Mr. Sharp, the specific time and tolerance associated with them, yes. And counsel for Raytheon says, sure, and I'm talking about the specifics. I'm not talking about the general recipe. So there was repeated testimony and statements by Raytheon's counsel that the trade secret 14 was the specific recipe. What cite do you have for that, about Raytheon's counsel? That last one? Yeah. That was 6816, Your Honor. So there were repeated statements by Raytheon witnesses, Raytheon's counsel, that the trade secret was the specific recipes. And Mr. Sharp testified that he developed the recipes with the help of vendors. That is at 6992, in consultation with the parts suppliers. His own notes show that they were... And this is at 11230 and 11246-47. He talks about using trial and error, consulting with vendors, consulting with textbooks to get the specifics on the temperatures and the specifics of the process. There was ample evidence that the jury could have relied on and apparently did rely on after this lengthy jury trial to find that there was no misappropriation of a trade secret 14. The other side pointed to JA9805-06 this morning, out of what we now know as Volume 5. Right. That was from the expert, the indigo expert, Nowth. And I think Judge Dyke was exactly right that he was talking there about the specifics because his testimony is what I started off reading at 9727 through 9728 where he talks about this idea of subassembly sequential baking was something that was well known that he himself had done at a prior company. That's the same witness. And the jury easily could have relied on that. Counsel didn't talk about Trade Secret 30, but the analysis is effectively the same. Their theory there was that the trade secret came over with a former Raytheon employee, Magoon. They never called Magoon to testify. And Mr. Schweikert, who was an indigo employee who had never worked at Raytheon, testified that he developed that process on his own, and he talked about all the experiments he did. All that evidence has to be accepted as true, and that establishes that there was no misappropriation. In my time remaining, if I could, I'd like to, unless there are further questions on the main appeal, I'd like to shift to our cross appeal. Okay. You can turn to your cross appeal. Sure, Your Honor. The district court committed an error of law by failing to appreciate that a choice of law determination is a decision on the merits for purposes of Texas law. Well, it can be, but the question is whether the choice of law decision here defeated the claim. And I don't see in your brief that you say there's any difference between the claim under Texas law or California law. In fact, to the extent that there's any difference, I gather that California law is more favorable. Well, there certainly is a difference on attorney's fees, Judge Dyke. No, no, but put that aside. On the underlying claim, in determining whether there was a prevailing party here, by getting a decision that California applied as opposed to Texas law, that didn't defeat any claim, did it? Well, it defeated a Texas claim, Your Honor, and I think the Texas courts follow a fairly formalistic approach to this. Okay, but the Texas claim on the trade suit is no different from the California claim, or at least it's no more favorable for that, right? Well, it is different on attorney's fees, and it is different in the sense of it is under a different body of law. There are cases from Texas, for instance, when a party proceeds to trial on a contract claim, even though the factual basis is the same as the TTLA claim. If the TTLA claim was voluntarily dismissed, or was non-voluntarily dismissed earlier, there would still be an award of fees because it's a claim-specific analysis. And the court here... And was it your position all along that Texas law should apply to the trade secret claim? No, to the contrary, Your Honor. Our position all along was that California law applied. We repeatedly said that, and nonetheless, Raytheon clung to both claims for years and years through at least five years of litigation. When it came up to this court the last time, when this court kind of knocked the legs out from under the only basis for denying us fees under the TTLA, when it went back on remand, all of a sudden Raytheon agreed that, of course, California law applies. We're going to get rid of this guy. How much fees are you actually looking for? I mean, it seems like where the choice of law was still unresolved, the basic problem then of the trade secret case was running forward and was going to run forward either way, and ultimately when the facts were on the ground and materialized, we would know it's either California or Texas. So it's not clear to me even if you were to get fees under the TTLA, just what kind of fees you would deserve. Well, Judge Shinnen, we never got to that point because the judge— Right. So I'm asking you now, what is it that you're looking for? Well, it would be—there might be—I can't give you an answer today because that question was never briefed. The record was never developed on, for instance, was there separate work required. You want to collect the cost of arguing that California law applied rather than Texas law. Well, that would be one possible way of doing it, or you might split it 50-50 given they were proceeding under both. But did you ever file a motion that California law should apply and not Texas law? No, we never filed a motion. That was our position all along, and we would have had to file a motion before trial. Summary judgment was granted. Where are the costs, then? Pardon me? Where are the costs? Well, the costs are in having to litigate both these claims together. So these are all questions for the district court on remand, if we get a remand, the court and its discretion. Help us understand the logic of what's going on here because at the moment I don't see any delta in having an additional legal cost burden of a specific Texas-based cause of action versus the California cause of action when it was the same basic cause of action that was being litigated. Right. Your Honor, as far as entitlement to fees, I don't think that's the relevant question under Texas law. I understand. So, for instance, if you go to trial on the contract claim. I'm just trying to understand where's the delta. Right. Well, there could have been. There was legal research on these issues. There was legal research on venue when the case was first filed in Texas despite all the relationships with Texas, with California. But you never filed a motion on the choice of law. No, we didn't because we got summary judgment on statute of limitations, so it was a different basis. And then when it came back down from this court, then that's when, as parties were proceeding toward trial, that issue would have been teed up, but all of a sudden they then withdrew the claim. But this is, again, this would all be within the discretion of the district court. The district court could look at, well, I see you having to litigate both these together. They're very similar claims, so I'm going to give only a certain percentage. Why any percentage? Because there may have been specific work done, and we were put to the test of defending against a Texas law claim for five years. If the evidence you developed was equally useful for Texas and California law, why should you get any fees with respect to the development of that evidence? Well, again, Your Honor, that would be a question for the district court on remand and the exercise of its discretion. My question is, what is the basis for getting any legal fees for evidence development when you had to develop the same evidence no matter which law? Well, I mean, you could flip that around and say we had to. If you can't segregate it, then we're entitled to fees, and that is the law in some states. But, again, I think these are all questions for the broad discretion of the district court. The district court very well might not say you get all of it. Maybe you get a percentage. Maybe the district court would require us to show what specific work did you have to do because of the filing of the suit in Texas and the venue in Texas. The district court already said no. The district court said no at the threshold, but he never got to these questions that we're talking about now. Those would be remand questions. The district court made a legal error in concluding and failing to appreciate that the choice of law determination is a decision on the merits, and a voluntary withdrawal of a claim in order to avoid that decision can and does trigger fees under Texas law. But there was no choice of law motion on the books. There was no motion, but the issue was patent. The issue lurked. The issue was going to have to be decided, and there's no requirement that there be a pending motion. So suppose there were an issue about which version of the statute applied, whether the statute was amended, and the question was whether the original statute applied or the amended statute applied, but it didn't make any difference which applied. Are you suggesting in those circumstances that a determination that the amended statute applied rather than the original statute applied would result in legal fees? I don't think so, Your Honor. But this is fundamentally different, and Vasquez and the other cases that we cite explain that a choice of law determination has claim-preclusive effect. So if you get a choice of law determination that California law applies rather than Texas law, that is a decision on the merits of the Texas law claims. It means you cannot bring that Texas law claim ever again. What about the fairly common scenario where someone alleges trade secret misappropriation, but they're not exactly sure of the locus, or the primary locus of that misappropriation? Maybe it happened more in this state, or maybe the defendant's shenanigans were really primarily located in a different state. So I'm not really sure, but I'm going to allege both, and ultimately I'm going to pursue one over the other. Once after discovery, I understand really where the alleged misappropriating acts took place. And then ultimately it turns out there's a Texas claim, but that's not the right place after discovery. It's really this other state. Every single time the defendant's going to be able to ask for TTLA fees because that unilateral withdrawal of the Texas claim was to avoid a choice of law adverse opinion? I don't know why I would say every single time, because it would be an inquiry into what motivated the withdrawal. But Texas has made a decision to award fees on a mandatory basis. It's a loser pay system in both directions. And the Texas Supreme Court's decision in EPS addresses this issue and says, yes, this might disincentivize parties to withdraw losing claims, but the Texas legislature made the judgment that when legal relationship between the parties has changed, fees should be awarded. So if no more questions, we'd ask that for affirmance on the main appeal and for a reversal on our cross-appeal. Thank you. Your Honor, briefly on Trade Secret 30, the institute sealing process, Carlton Magoon was the engineer at Raytheon who was credited with discovering that trade secret and embodying that at Raytheon. In the record on AppSite 11499, his initial job worksheet at Indigo, the very first task he was asked to do was develop institute vacuum processing system for IR detector packages. When he was hired on, that's what he was asked to do. At AppSite 11512, his first year annual performance review, the very first thing under his notable accomplishments was one of the key duties when Carlton was hired was to develop institute vacuum processing for the auto cam package. His design efforts have been directed towards a device that can be mass produced and a repeatable and reliable process. That is how Indigo obtained improperly Raytheon's Trade Secret 30. They have not disputed that. Their only evidence to attempt to dispute that is that Mr. Paul Schweikert years later performed some testing to tweak the process. I thought you said in your opening argument there wasn't any evidence that the cascading bake was well known and your opposing counsel has just read several excerpts from the record that say that. Your Honor, the idea of piece part vacuum baking, the idea of final vacuum baking, is well known. Vacuum baking is nothing new. As Mr. Knaut, their own expert, said, the trade secret as practiced by Raytheon and Indigo is not well known. Mr. Knaut also. That's a different question. You keep changing the definition. Your Honor, the question is you were arguing in your opening argument that the cascading bake, the very concept of it, was a trade secret and just read all sorts of testimony from the record that says it's not a trade secret. It was well known. So that's a problem for you. Your Honor, I appreciate your position on that and your comment on that. Mr. Knaut testified on cross-examination that the concept of sequential piece part vacuum baking is not well known. And anyway, Your Honor, that goes to whether or not it is a trade secret and the jury found that it was. The defendants have admitted they practiced the exact same vacuum bake that we do. At the app, appendix 9777 and 78, Mr. Farhad Mirabad, one of the engineers for Indigo, he was asked, okay, second fundamental process that Indigo considers fundamental, piece part vacuum bake. Yes. At least according to 420, the exhibit. And we've talked about that at length. This is the piece part, the same piece part vacuum bake that you learned at Raytheon. Correct. Also from the app, 9806 and 9807, Mr. Knaut testifying again. Question. Your testimony, I believe, was that your understanding was that Raytheon's piece part vacuum bake process is really just a breakdown to bake out contaminants based on steel, gold, paint, and epoxy limits. Is that accurate? Answer, that sounds about right. On page 9807. I want to go over, I believe it's the 23rd page. This is from lines 3 through 14. It's a section called fundamental processes. There, thank you. And I want to go down to the second bullet point. And this is where Indigo describes as fundamental process a piece part vacuum bake for the steel limit, gold limit, epoxy, and paint limits. Right? What if we agree or find that it was reasonable for the jury to conclude that the scope of your trade secret is something more specific and it has all the timing and temperature details, that level of a true recipe, then is it likewise reasonable for the jury to have concluded, based on the record, that there was no misappropriation of that narrow understanding of the trade secret number 14? Respectfully, no, Your Honor, because that didn't happen. And I also want to discuss, you actually mentioned the charge. Are you arguing with the premise of my question or are you arguing with the question? I'm arguing with the question, the premise. If the trade secret had ever been defined that specifically, I might agree with your premise. However, to your note, the jury charge, which was a list of 31 trade secrets, which was a chart that was in front of the jury from the opening statement through closing, trade secret 14 was defined as method and use of sequential vacuum bake. That was the definition of the trade secret that was provided to the jury. It never changed. Indigo never objected, claiming that it was not specific enough, not during discovery, not during pretrial motion practice, not during the jury charge. Indigo didn't have a problem with trade secret being defined that broadly, the method and use of a sequential vacuum bake. That's how it was defined. You haven't pointed to any evidence that that was a trade secret. There's been plenty of evidence pointed out by the opposing counsel saying that this was well known, what you define as the general trade secret. Aside from that one exchange by one witness who elsewhere made perfectly clear that the general concept of sequential baking was well known, you have nothing to suggest in this record that the concept of the general concept of sequential baking was not well known. Respectfully, Your Honor, the jury was charged with the definition of trade secret 14, method and use of a sequential vacuum bake, and they found that to be a secret. Indigo has not appealed that. They have not raised any error claiming that the trade secret was not sufficient. They certainly have. They've argued that the general thing was not a trade secret and that wasn't what the jury found. Your Honor, they have not moved to overturn the jury's verdict with respect to the secret status. The jury found it to be a secret. It has not been charged. When you say it, though, that's the question. When you say they found it to be a secret, that's what we're trying to figure out. The jury had to figure out what it is, and they very well may have concluded that it is something narrower than you believe it to be. Well, what we have, Your Honor, is the jury charge. That is what we have to work with. The jury charge, the secret was defined as method and use of a sequential vacuum bake. Indigo did not request a limiting instruction. They did not request any instruction or any kind of comment from the court to further limit or identify the trade secret. That is the definition of the trade secret that the jury found to be secret. That is the totality of the definition. Indigo never complained that it should be more. I see you're out of your time. Can you speak to me about the cross appeal? The cross appeal, Your Honors, are exactly correct. The choice of law was never made. As you said, we pled under both laws because we did not know prior to discovery which locus and which facts would be more germane to the trade secret definitions and the misconduct. After the appeal on the statute of limitations, it was repled. We pled under California law. There was no choice of law. There was no fight as to law. We pled under both. They said they thought it should be California. We agreed. There was no dismissal with prejudice. There was no adverse finding. The statute, the TTLA and the CATUSA statute on the definition and the recovery of a trade secret case are, in all aspects, effectively identical. There was nothing difficult. Our position didn't change. We did not avoid any kind of a ruling on the merits. We proceeded with a trade secret case. We tried a trade secret case. There was nothing different under CATUSA and under TTLA. I guess the other side is saying what you're trying to avoid is TTLA fees. And at trial, they actually charged the jury with the bad faith question, so they would be entitled to fees under the CATUSA standard if the jury found that the litigation was pursued in bad faith. The jury was charged with that. The jury found there was no bad faith. So we're not trying to avoid anything. The jury was charged with the question of whether the conduct was bad faith on their part or the lawsuit was brought in bad faith on our part. The jury found no to both. We weren't avoiding anything. Fees were always in play. The statutes were identical. The case law was identical with respect to the standard for pursuing a trade secret case. We didn't avoid any kind of a trial on the merits or any kind of a substantive ruling by simply electing California law as they pressed for. Okay. Any more questions? Any more questions? Thank you. Thank you, Your Honor. The case is taken under submission.